UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| GOOGLE PAYMENT CORPORATION<br>    1600 Amphitheatre Parkway<br>    Mountain View, CA 94043,<br><br>                            Plaintiff,<br><br>                - against -<br><br>CONSUMER FINANCIAL PROTECTION<br>BUREAU<br>    1700 G Street NW<br>    Washington, DC 20552,<br><br>and<br><br>ROHIT CHOPRA, in his official capacity as<br>Director of the Consumer Financial Protection<br>Bureau,<br>    1700 G Street NW<br>    Washington, DC 20552,<br><br>                            Defendants. | **COMPLAINT** |

Plaintiff Google Payment Corporation ("GPC"), for its complaint against defendants the Consumer Financial Protection Bureau (the "CFPB" or "Bureau") and Rohit Chopra, in his official capacity as Director of the Consumer Financial Protection Bureau, alleges as follows:

## **INTRODUCTION**

1.    GPC is a subsidiary of Google LLC that offers a limited set of payment products. The payment product at issue here, a peer-to-peer (P2P) payment product available through the U.S. Google Pay app, was retired in June of this year to simplify the user experience and for other business reasons.

2.      On November 8, 2024, the CFPB issued the challenged order, designating GPC for "supervision"—a burdensome form of regulation that would subject GPC to on-site examinations and requests for confidential documents and information—based on alleged "risks to consumers." *See* CFPB Supervision Decision and Order (the "Order," attached as Exhibit A).  The CFPB conceded that the Order was not a determination that GPC violated any laws or engaged in any wrongdoing.  Instead, the Bureau based its finding of "risks to consumers" entirely on allegations from a small number of unsubstantiated user complaints involving the retired P2P product.

3.      The CFPB's decision suffers from numerous legal defects.  Contrary to well-settled canons of statutory interpretation, the CFPB claims that supervision is warranted so long as it can allege that some risks to consumers existed *in the past*, "regardless of what products [an entity] presently offers" and even when there is no "possibility of harm in the future."  Order 15.  But Congress did not authorize the CFPB to designate a company for ongoing supervision based on a product it no longer offers.  Congress intended the CFPB's risk-based supervision authority as a mechanism to address current or future risks to consumers—which are not present, or even possible, here.  *See, e.g.*, 12 U.S.C. § 5514(a)(1)(c).  As a matter of common sense, a product that no longer exists is incapable of posing such risks.

4.      Even putting aside the CFPB's incorrect view that it may rely entirely on a retired product, the CFPB committed legal error by setting what it admitted was an exceedingly low bar for what counts as sufficient "risks to consumers" warranting supervision.  Rather than reserving its supervisory authority for material risks, the CFPB erroneously claimed the authority to supervise based on any quantum of risk, including de minimis or routine risks inherent in the offering of any consumer financial product.  It also claimed the authority to supervise based on risks unrelated to the Federal consumer financial laws.  The CFPB contends that congressional

*silence* granted it authority to determine whether the quantum or character of risks purportedly posed by a covered person's conduct warrant supervision.  Order 2.  This argument runs headlong into the major-questions doctrine.  *Whitman* v. *American Trucking Associations*, 531 U.S. 457, 468 (2001) (citation omitted).  It also requires reading the statute to provide the agency with standardless discretion to impose supervision, an unconstitutional reading that would violate the non-delegation doctrine.  *See Gundy* v. *United States*, 588 U.S. 128, 135-136 (2019).  Under any reasonable standard, the CFPB failed to provide sufficient evidence that GPC *ever* posed "risks to consumers."

5.      The CFPB based its decision on just 26 cherry-picked and unverified complaints regarding GPC's now-retired P2P product across a three-year period, which is an infinitesimally small number of complaints in comparison to "millions of payment transactions" the CFPB concluded the product facilitated during that same time period.  Supplemental Brief of Initiating Official at 17 (Aug. 31, 2023) ("CFPB Supp. Br.").  The Bureau made no effort to assess whether the quantity of complaints, even if they were verified, was significant or material in light of the number of transactions processed.  In any event, GPC submitted detailed evidence—including information from its internal systems as to which the CFPB did not have access—showing why none of the complaints demonstrates "risks to consumers."  For example, a number of the complaints were determined to be mistaken after a thorough investigation by GPC, and, in some other instances, customers simply chose not to respond to GPC's follow-up requests for information needed to investigate their concerns.  But in a clear violation of administrative law principles, the CFPB simply ignored that evidence in its decision.

6.      The agency also erred in giving no weight to GPC's affirmative evidence.  This includes evidence of GPC's comprehensive compliance program; its frequent and ongoing

oversight and examination by numerous state regulators; and a report by an expert consulting firm concluding that GPC appropriately investigates consumer complaints and "meaningfully engage[s] with consumers to resolve their concerns" and that the complaints at issue do not indicate risks to consumers warranting supervision.

7.    In disregarding GPC's evidence and giving itself opportunities to allege *new* risks up through the conclusion of the administrative proceeding, the CFPB also repeatedly violated its own procedural rules and its statutory obligation to give GPC a "reasonable opportunity" to respond to the CFPB's allegations of risk.  12 U.S.C. § 5514(a)(1)(c).

8.    Compounding these violations, the CFPB threatened GPC that it would publicize the designation of the company as posing "risks to consumers" if it exercised its statutory right to contest the agency's allegations, while offering confidentiality if GPC elected simply to consent to supervision.  This coercive threat is now CFPB policy towards any company that it accuses of posing "risks to consumers."  Further, after the CFPB provided its designation order to GPC on a confidential basis, on information and belief, the upcoming publication of the Order was leaked to the media, without GPC's knowledge or consent, and at a time when GPC was not permitted to discuss the confidential order publicly and thus could not respond to press inquiries or address inaccuracies regarding the nature or scope of supervision.  This leak further magnified the potential reputational harm of the Order.

9.    The CFPB's conduct violates multiple restrictions on agency action.  Under its interpretation, *any* covered person that *ever* engaged in conduct that the Bureau determines in its discretion to have posed *any* alleged risk to consumers is subject to the full weight of the CFPB's supervisory authority.  Order 2, 14-16.  And any company that declines the CFPB's request that it consent to supervision—and instead chooses to exercise its statutory right to contest the CFPB's

allegations of "risks to consumers"—will be met with the publication of CFPB's designation order. This position sends a chilling and damaging message to all companies seeking to innovate in the consumer financial services space. For these and other reasons, GPC respectfully requests that this Court set aside the CFPB's unlawful order.

## JURISDICTION AND VENUE

10.    This action arises under the United States Constitution and the Administrative Procedure Act, 5 U.S.C. §§ 500 *et seq.*  This Court has jurisdiction pursuant to 28 U.S.C. § 1331.

11.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(e)(1) because the administrative proceeding against plaintiff occurred substantially in the District of Columbia, and defendants are an agency and an officer of the United States resident in this judicial district acting in their official capacities.

## PARTIES

12.    Plaintiff Google Payment Corporation is a Delaware corporation headquartered in Mountain View, California.  GPC is a wholly owned subsidiary of Google LLC, which is a wholly owned subsidiary of Alphabet, Inc., a publicly traded company.

13.    Defendants are the Consumer Financial Protection Bureau and Rohit Chopra, in his official capacity as Director of the Consumer Financial Protection Bureau.  The Consumer Financial Protection Bureau is a federal administrative agency headquartered in Washington, D.C. Defendant Chopra acted under color of law at all relevant times.

## FACTS

### A.    Background

#### 1.    *Google Pay and Google Pay Balance*

14.    When the CFPB first initiated its proceeding to designate GPC for supervision in March 2023, GPC offered three purportedly relevant payment products: a peer-to-peer (P2P)

payment product, a stored-value product known as Google Pay Balance, and the "Google Pay Balance Card." *See* Declaration of Ronnette Grant ¶¶ 5, 8 (May 19, 2023) ("Grant Decl."). These three products were accessible in an application called "Google Pay." As described below, GPC notified the CFPB on June 7, 2024 that the Google Pay app and its P2P product had been successfully retired.

15. Until its retirement, the P2P product allowed users to send and receive funds from other Google Pay users who are U.S. residents. *See id.* ¶ 6; *id.*, Exhibit A (Google Pay/Google Payments Additional Terms of Service (U.S.)), ¶ B.1.1(a). The P2P product was intended for personal transactions between users. *Id.* ¶ B.1.1. These transactions could be funded with ACH-enabled checking or savings accounts, with certain debit cards, or with the Google Pay Balance. *Id.* ¶ B.1.1(b).

16. Google Pay Balance is GPC's stored-value product. Before the retirement of the Google Pay app and the P2P product, Google Pay Balance could be used to fund P2P transactions; could be funded by transferring money from an accepted debit card, an ACH-enabled checking account, or an ACH-enabled savings account; and could receive funds from P2P transactions. Grant Decl. ¶ 7. Users could also withdraw funds from Google Pay Balance to a bank account (for no charge) or with a debit card (more rapidly but with a small fee). *See* Grant Decl., Exhibit B (Google Pay Balance Long Form Disclosures). Following the retirement, users are able to withdraw any remaining funds in their Google Pay Balance to a bank account or spend the balance using a preexisting Google Pay Balance Card, but they cannot add additional funds to their balance or send or receive funds in P2P transfers. *See* Response to Supplemental Brief of Initiating Official at 5 (Feb. 2, 2024) ("GPC Resp. to Supp. Br.").

17.    The Google Pay Balance Card is a virtual card issued for use in digital form that allows users to spend their Google Pay Balance when making contactless purchases at physical stores that accept Google Pay, or in-app or online purchases.  *See* Grant Decl. ¶ 8.

18.    As noted, on June 7, 2024, GPC retired the U.S. version of the Google Pay app and the P2P product.  GPC notified users of the upcoming retirement months in advance (in February 2024) and through multiple channels (including blog posts, emails, and notifications within the Google Pay app).  Since then, users can no longer use the Google Pay app or the P2P product. Users can instead spend their remaining Google Pay Balance using Google Wallet's Tap and Pay function or by using a Google Pay Balance Card; users can also withdraw the funds through Google Pay's web interface.

19.    GPC does not offer products known as "Tap and Pay," the "GPay Button," or Google Wallet, all of which are the responsibility of Google LLC.  *See* Grant Decl. ¶¶ 10-11. These products were thus beyond the scope of the CFPB's Notice of Reasonable Cause, which began this proceeding and was directed only at GPC.  *Compare* Notice of Reasonable Cause at 1 (Mar. 20, 2023) ("Notice"), *with* CFPB Supp. Br., 10 n.28.  The Bureau has so conceded.  *See* ¶ 49, *infra*.  Although the Bureau suggests that GPC is "opportunistically invok[ing] the corporate form," Order 8 n.52, the Bureau provides no evidence to support that gratuitous allegation.  GPC brought the distinction between GPC and Google LLC to the Bureau's attention early in this proceeding, but the Bureau elected to remain focused on GPC and its P2P product.

### 2.    *GPC's Compliance Program and Examination by State Regulators.*

20.    GPC has an extensive compliance program and is regularly examined by state regulators.  As explained in a detailed declaration filed with the CFPB early in this proceeding, GPC's compliance program is supported by a team of compliance professionals with years of experience, including at financial regulatory agencies and major financial institutions.  The

compliance program maintains policies, procedures, and a training program, which are regularly refreshed, to ensure compliance with applicable statutes and regulations.  Among other things, the compliance program ensures that GPC complies with the Electronic Fund Transfer Act (EFTA) and its implementing regulation, Regulation E, and that GPC does not commit unfair, deceptive, or abusive acts and practices.  The compliance program helps ensure that the process for reviewing consumer complaints—which can be filed with GPC through a number of channels—is well-managed and complies with applicable law.

21.    Among other components, GPC's compliance program includes:

a.    An annual "enterprise risk assessment" calibrated to detecting "known and emerging risks across GPC," the results of which "are shared with the GPC Board." Grant Decl. ¶ 25.

b.    A "continuous risk monitoring program" that "generates data to support . . . the risk management team."  *Id.* ¶ 26.

c.    Internal audits, led by "a dedicated internal audit partner team that focuses on payments products."  *Id.* ¶ 27.

22.    In connection with the retirement of the P2P product, GPC "prepared a comprehensive wind-down process plan to ensure customers have the ability to withdraw funds and otherwise adjust to" GPC's retirement of the Google Pay app.  *See* Declaration of Ronnette Grant ¶¶ 5-6 (Feb. 2, 2024) ("Grant Supp. Decl.").

23.    As GPC also explained to the CFPB in this proceeding, GPC is subject to extensive and frequent examinations by numerous state regulators, which license GPC as a money transmitter.  Grant Decl. ¶¶ 4, 31.  These regulators assess GPC's compliance with state and federal regulations in single-state or multi-state examinations.  *Id.* ¶¶ 31-33.  Between five and 10

states examine GPC annually, with over 15 different states examining GPC in recent years. *Id.* ¶ 31. These examinations review GPC's financial condition, compliance oversight, cybersecurity and controls, and, most notably, compliance with state and federal requirements. *Id.* ¶ 31. Over the last five years, there have been no deficiencies noted in complaint handling or other state or federal consumer-protection areas. *Id.* ¶ 33.

24.     GPC's compliance team "also works with in-house legal counsel as well as the Consumer Support Escalations Team to handle any consumer complaints received directly from state agencies." Grant Decl. ¶ 40.

    *3.*   *The CFPB's Supervisory Authority.*

25.     In the wake of the 2008 financial crisis, Congress enacted, as part of the Dodd-Frank Act, the Consumer Financial Protection Act. Pub. L. 111-203, 124 Stat. 1955 (2010). The statute established the CFPB as an agency tasked with "enforc[ing] Federal consumer financial law." 12 U.S.C. § 5511(a); *see also id.* §§ 5481-5603.

26.     The Bureau has authority under 12 U.S.C. § 5515 to supervise banks and credit unions with more than $10 billion in assets.

27.     The Bureau has authority under 12 U.S.C. § 5516 to engage in more limited examination of banks and credit unions with less than $10 billion in assets.

28.     The Bureau also has authority under 12 U.S.C. § 5514(a) to supervise *nonbank entities* in certain limited circumstances. Historically, states have supervised certain categories of nonbank providers of consumer financial products and services. Contrary to the Bureau's unconstitutional reading of the statute, Congress carefully delineated the scope of supervisory authority when granting it to a federal agency for the first time. *First*, Congress authorized the CFPB to supervise nonbank entities that offer certain products or services related to mortgage lending, student loans, or payday loans. *See id.* § 5514(a)(1)(A), (D), (E). *Second*, Congress

authorized the CFPB to, "by rule," identify a "market" for "consumer financial products or services" and supervise the "larger participant[s]" within that market. *Id.* § 5514(a)(1)(B). *Third*, Congress authorized the CFPB to supervise a company if the agency has "reasonable cause" to find, "after notice . . . and a reasonable opportunity . . . to respond," that the company "is engaging, or has engaged, in conduct that poses risks to consumers with regard to the offering or provision of consumer financial products or services." *Id.* § 5514(a)(1)(C). In other words, when the CFPB undertakes to designate a particular company for *risk-based* supervision, the statute requires it both to follow certain procedural rules (*i.e.*, provide "notice" and a "reasonable opportunity" to respond) and also to clear a substantive bar (*i.e.*, "reasonable cause" to determine that the company "poses risks to consumers"). *Id.*

29.    These procedural and substantive protections exist because supervision—which was traditionally reserved for banks—is extremely intrusive and burdensome. Contrary to the CFPB's claim that supervision brings only "limited consequences," Order 3, the statute provides that the CFPB "shall require reports and conduct examinations" of supervised entities, *id.* § 5514(b)(1), and the CFPB claims the authority to "[g]o onsite to observe, conduct interviews, and review additional documents and information." *See Supervision and Examination Manual, Overview* at 5 (Jan. 2023), http://tinyurl.com/ExaminationManual ("Examination Manual"). The Bureau even claims the right to obtain attorney-client privileged information from supervised companies. *See* Confidential Treatment of Privileged Information, 77 Fed. Reg. 15,286 (Mar. 15, 2012). And depending on the findings from the examinations, the supervisors may refer a company for "public enforcement action," whether through the Bureau's administrative enforcement proceedings or in a civil action in federal district court. *See* Examination Manual, Overview, at 6-7. Additionally, under a recently issued CFPB regulation, all nonbank entities

under the CFPB's supervisory authority are required to submit certain information to a "public registry" maintained by the CFPB. *See* Registry of Nonbank Covered Persons Subject to Certain Agency and Court Orders, 89 Fed. Reg. 56,028 (July 8, 2024).

30.     In 2013, the Bureau promulgated a procedural rule governing risk-based supervision proceedings. *See* Procedural Rule to Establish Supervisory Authority Over Certain Nonbank Covered Persons Based on Risk Determination, 78 Fed. Reg. 40,352 (Jul. 3, 2013) (codified as amended at 12 C.F.R. pt. 1091). That procedural rule required the Bureau to issue a "Notice of Reasonable Cause" to a nonbank entity it believed to be engaging in behavior warranting risk-based supervision. 12 C.F.R. § 1091.102(a) (2013). The rule required that such notice contain a sufficient "description of the basis for the assertion that the Bureau may have reasonable cause to determine" that risk-based supervision is warranted, "including a summary of the documents, records, or other items relied on by the initiating official to issue a Notice." *Id.* § 1091.103(a)(1). The rule also outlined the requirements for the nonbank entity's written response, the procedure to request a supplemental oral response, and the timeline for the Associate Director and the Director of the Bureau to make a decision. *Id.* § 1091.108. The Bureau explained in the 2013 version of the rule that, in evaluating risks to consumers, "it expects to consider . . . whether a nonbank covered person has engaged in conduct that would pose risks to consumers because, for example, it involves potentially unfair, deceptive, or abusive acts or practices, or because *the conduct otherwise potentially violates applicable Federal consumer financial law*." 78 Fed. Reg. at 40,357 (emphasis added). The rule was concerned with "potential law violations or harms to consumers," not de minimis past risks that covered persons had already resolved. *Id.* at 40,358. The 2013 version of the rule did not prescribe any procedure or authority

11

for the Bureau to submit supplemental briefing or additional evidence beyond the initial notice. *See id.* § 1091.102.

31.     Even after the 2013 procedural rule, the Bureau did not invoke its authority for nearly a decade longer, openly describing the authority as "dormant" as late as 2022. *See* Consumer Financial Protection Bureau, *CFPB Invokes Dormant Authority to Examine Nonbank Companies Posing Risks to Consumers* (Apr. 25, 2022), http://tinyurl.com/CFPBDormantAuthority. The day after the CFPB announced that it would invoke this authority, it singled out particular companies as a target, with the Bureau's Director testifying that the Bureau was preparing for the "the era of Big Tech" companies' entrance into the market for "consumer payments." *Written Testimony of Director Rohit Chopra Before the Senate Committee on Banking, Housing, and Urban Affairs* 4-5 (Apr. 26, 2022).

32.     At that time, in preparation to use the dormant authority, the Bureau amended the procedural rule to allow for public release of supervisory designations based on "risks to consumers"—despite the fact that a hallmark of supervision is its confidentiality and the CFPB had previously protected the identities of its supervised entities and the CFPB's findings about their business and compliance practices. *Compare* Procedural Rule To Establish Supervisory Authority Over Certain Nonbank Covered Persons Based on Risk Determination, 78 Fed. Reg. 40,352, 40,370 (July 3, 2013) ("information relating to a proceeding shall be deemed confidential supervisory information"), *with* Supervisory Authority Over Certain Nonbank Covered Persons Based on Risk Determination; Public Release of Decisions and Orders, 87 Fed. Reg. 70,703 (Nov. 21, 2022) (allowing public release of designations at the Director's discretion). As the Bureau's behavior in this case illustrates, the Bureau has elected to use the threat of publicity as a cudgel to pressure companies to forgo their statutory right to contest supervision.

**B.    Procedural History**

*1.    Notice of Reasonable Cause.*

33.    GPC received a Notice of Reasonable Cause from the Bureau on March 20, 2023.

Notice 1.

34.    The Notice alleged that the Bureau had reasonable cause to supervise GPC based on (1) GPC's "size" in the mobile wallet transactions market; (2) the income of GPC users, which the Bureau suggested was "likely lower income"; (3) GPC's "supervisory history," i.e. that GPC had not previously been subjected to federal oversight (ignoring GPC's history of state supervision); (4) GPC's "error resolution policies," alleging that GPC "disclaim[ed] any error resolution obligations to consumers under Regulation E," a regulation governing (among other things) certain erroneous transfers of electronic funds; and (5) the risk of "fraud, scams, and unauthorized transactions," suggesting that "Google Pay may be used as a tool in a variety of different scams," and citing, as evidence, no specific complaints against GPC but only the agency's public database of *all* complaints against *thousands* of companies going back to 2011.  Notice 3-5, 5 n.30.  Notably, the CFPB later abandoned most of these grounds for subjecting GPC to supervision.

35.    Although the Notice targeted GPC, the CFPB ascribed certain of these alleged unsubstantiated and speculative risks to products that were offered not by GPC but rather by Google LLC.  *See id.* at 2-3.  These products included Tap-and-Pay, Google Wallet, and the GPay Button.

36.    Although the CFPB had obtained extensive information in response to a "market monitoring" order in 2021 about payment products offered by Google and its subsidiary GPC, the CFPB tellingly did not cite any of that evidence in its Notice or allege that any of that evidence supported the view that GPC posed risks to consumers.  *See CFPB Orders Tech Giants To Turn*

13

*Over Information on their Payment System Plans*, CFPB (Oct. 21, 2021), https://tinyurl.com/MarketMonitoring.

37.     The Notice also indicated that GPC could "voluntarily consent[] to the Bureau's supervisory jurisdiction."  Notice 6.  One supposed benefit of voluntary consent was included in the Notice: Voluntary supervision would last for an initial period of two years (rather than indefinitely).  But the CFPB also offered an unwritten inducement: In a meeting shortly before issuance of the Notice, officials from the CFPB told GPC that they would recommend that a supervision order be kept confidential if GPC would consent to supervision.  The implicit threat was clear: If GPC exercised its statutory and constitutional rights to contest supervision, the CFPB would release to the public the reputationally damaging finding that GPC's products pose "risks to consumers."  The CFPB later formalized this threat.

> 2.     *GPC's Response to the Notice.*

38.     GPC timely responded to the Notice on May 19, 2023.

39.     Among other things GPC argued that the Notice failed to establish "reasonable cause" to exercise supervisory authority by failing to provide a plausible interpretation of the statutory standard for supervision and failing to identify sufficient evidence that GPC engages in conduct that poses risks to consumers.  Response to Notice at 1-2 (May 19, 2023) ("GPC Resp.").

40.      GPC explained that the Dodd-Frank Act did not allow the CFPB to supervise a nonbank entity based on *any* risks of *any* kind to consumers.  Rather, the statute contemplated that this special authority would be reserved for risks to consumers beyond those that were inherent or routine in offering any consumer financial product or service.  *Id.* at 5-11.  Congress instead intended that this supervisory tool—which focused on particular companies, rather than categories of companies—would be used for entities that posed non-routine, material risks to consumers.  And, further, these risks had to relate to potential or actual violations of the specific provisions of

14

Federal consumer financial laws that the CFPB is tasked with implementing. *See id.* Given that, as the CFPB has stated, all consumer financial products and services pose some risk to consumers, a contrary interpretation would assume that Congress had delegated implausibly broad power to the agency. *See id.* at 8-11 (citing the major-questions and non-delegation doctrines).

41.    GPC's response explained that, under any plausible interpretation of the statutory standard, the Notice failed to identify any risks to consumers that would justify supervision.

42.    For example, (1) on "size," the Notice never identified a "rational connection" between any evidence of GPC's size and any particular risk to consumers in the United States, GPC Resp. at 16; (2) on the income of GPC users, the Bureau's purported evidence regarding "vulnerable populations" confused Google LLC's Wallet App with the GPC P2P product at issue and was therefore inapposite, *id.* at 18; (3) on supervisory history, a "lack of past federal supervision" could not justify supervision unless "the Bureau [were] entitled to supervise any entity that has not yet been supervised," *id.* at 12; (4) on error resolution, the Bureau simply misread GPC's policies in concluding that the company "disclaimed" error resolution obligations under Regulation E, *see id.* at 14-15; and (5) on fraud, scams, and unauthorized transactions, in addition to failing to identify what GPC conduct posed a risk to consumers, the Bureau's reference to the entire CFPB database of complaints against any entity failed to provide notice of which complaints indicated a risk to consumers, and none "indicate[d] a material risk to consumers arising out of violations of Federal consumer financial law." *Id.* at 21.

43.    GPC also provided a report by independent third-party consulting firm Treliant, which has extensive experience in consumer financial protection. Treliant reviewed all complaints submitted to the CFPB regarding GPC in the relevant timeframe, along with related documentation. *Id.* at 86a-91a. Treliant determined that "GPC was responsive to complaints and

meaningfully engaged with consumers to resolve their concerns;" that "GPC generally handled complaints related to its P2P and Google Pay Balance products appropriately"; that, contrary to the CFPB's suggestion, the vast majority of complaints do not allege an unauthorized transaction, fraud, or scam; and that it "did not see evidence of a material risk to consumers with respect to Federal consumer financial laws." *Id.* at 89a.

44.    GPC also objected to the Bureau's coercive position that it would keep the fact of supervision confidential if GPC consented to supervision, but it would publicize the Bureau's finding of "risks to consumers" if GPC elected to exercise its statutory right to contest supervision. GPC Resp. 23 n.11.  GPC explained that there was no valid regulatory purpose in providing confidentiality to consenting entities but not to entities asserting their rights.

45.    On July 17, 2023, counsel for GPC and the Bureau's Initiating Official made a supplemental oral response before the Acting Associate Director of the CFPB's Division of Supervision, Enforcement and Fair Lending. *See* Supplemental Oral Response Transcript (July 17, 2023).  The Associate Director reiterated that there would be "no discovery," no "examination or cross-examination," and that the CFPB could not rely on "any argument or information not included in the Notice of Reasonable Cause." *Id.* at 6.  Violating that direction, the Initiating Official for the first time cited specific consumer complaints that supposedly showed a risk to consumers.  *See id.* at 43-45.  GPC objected to the introduction of new evidence, which was contrary to the Bureau's regulations and the Associate Director's instructions.  *Id.* at 56.

### 3.    *The Bureau's Supplemental Brief.*

46.    Ten days later, the Bureau authorized the Initiating Official to provide "additional analysis," which could rely on or analyze "any consumer complaints made to CFPB." *Id.*

47.    GPC strenuously objected, explaining that a supplemental filing containing such analysis would violate the Bureau's procedural rules.  The Bureau's initial notice was required to

contain a "summary of the documents, records, or other items relied on by the initiating official to issue a Notice." 12 C.F.R. § 1091.103(a)(1) (2013). The Bureau's procedural rules applicable at the time also did not provide for any supplemental briefing, providing only that, after any oral response, the Bureau would issue its decision. *Id.* § 1091.102(a).

48.    The Bureau proceeded with the supplemental brief regardless. The Initiating Official's August 31, 2023 supplemental brief bore almost no relation to the initial notice. It focused primarily on GPC's P2P product, articulated a new interpretation of the relevant statutory language, cited to 33 complaints not identified or summarized in the initial Notice, and asserted new theories of risk based on those complaints.

49.    The supplemental brief conceded that any issues "related to product features offered by Google LLC, not GPC," were not relevant to the proceeding. CFPB Supp. Br. 10 n.28. That excluded any alleged risks from Tap and Pay, the GPay Button, and Google Wallet. *Id.* It also abandoned several of the supposed risks to consumers contained in its Notice—for instance, lack of past federal supervision and supposed risks to "lower income" consumers. *See* GPC Resp. to Supp. Br. 12. And the Initiating Official's supplemental brief simply ignored, and therefore conceded, GPC's arguments and evidence that its compliance program, the frequent examinations by state regulators, and other federal regulatory mechanisms provided sufficient assurance of compliance with Federal consumer financial law and negated any showing of risks to consumers. *Id.* at 12-13.

50.    Although the Initiating Official's brief disclaimed the suggestion that it could impose supervision if the Bureau found "*any* possibility of *any* loss however remote or insignificant" or if the risk was "outside the scope of consumer financial protection law," CFPB Supp. Br. at 8 (emphasis added), beyond this ipse dixit, it offered no coherent articulation of these

limiting principles.  The Bureau, in any event, would eventually retreat from these purported limitations in its final order, claiming unilateral discretion to determine the "character and magnitude of the risks" justifying supervision.  *See* Order 2.

51.     The supplemental brief also alleged new risks to consumers not found in the initial notice.  Citing 33 complaints—all but one of which involved the P2P product—the Initiating Official alleged that (1) GPC failed to explain its error-resolution determinations to consumers, conducted insufficient investigations, used template language in its responses, and failed to treat certain misdirected transfers as "errors," CFPB Supp. Br. 11-14; and (2) based solely on the alleged volume of complaints, GPC "may not be taking adequate steps to monitor, prevent, and detect fraud" and was "failing to adequately investigate claims from consumers," *id.* at 15.

### 4.     Further Supplemental Proceedings

52.     As GPC was preparing its response to the Initiating Official's supplemental brief, two critical developments eliminated any need for the risk-based proceeding.  First, GPC decided for business reasons to retire the U.S. version of the Google Pay app and the P2P product.[1]  Second, the CFPB issued a notice of proposed rulemaking to supervise a market for "large participants in a market for general-use digital consumer payment applications."  Defining Larger Participants of a Market for General-Use Digital Consumer Payment Applications, 88 Fed. Reg. 80,197 (Nov. 17, 2023).  GPC anticipated that the CFPB could take the position that GPC would fall within that market.  *See, e.g.*, Stacy Cowley, *Consumer Bureau Seeks to Supervise Digital Payment Apps*,

---

[1] *See* Joris van Mens, *Simplifying our payment apps in the U.S.*, Google (Feb. 22, 2024), https://tinyurl.com/PaymentAppsUpdate (explaining that GPC retired the Google Pay app's P2P product because "Google Wallet[] . . . is used five times more than the Google Pay app in the U.S.").

N.Y. Times (Nov. 7, 2023), https://tinyurl.com/NYTCFPBRule.[2]  In light of these developments, GPC asked the Bureau to hold the proceeding in abeyance, GPC Request for Abeyance at 2-3 (Nov. 22, 2023), but the Bureau denied this request.

53.    On February 2, 2024, GPC submitted its timely response to the supplemental brief of the Initiating Official.  *See generally* GPC Resp. to Supp. Br.  GPC explained that the company for business reasons would be retiring the U.S. version of the Google Pay app and its P2P product. *Id.* at 1.  GPC stated that the retirement would eliminate any purported risk to consumers that had previously been alleged by the Initiating Official; GPC further explained that—even without the retirement—the supplemental brief would have failed to show that supervision was warranted. *Id.* at 3-22.

54.    GPC demonstrated, through a declaration by its Chief Compliance Officer, that none of the complaints supported the CFPB's allegations of risks to consumers. *Id.* at 13-18.  The declaration addressed each complaint, categorized by the alleged risk the complaint was supposed to show.  The declaration was able to provide a more accurate assessment of the complaints than the CFPB was able to provide because it relied in part on internal documentation about the investigation of the complaints, which was information not reflected in the CFPB's public database of complaints and therefore unknown to the CFPB. *Id.* at 5a-15a.  For example, in certain cases where the Bureau suggested that GPC might not be conducting reasonable investigations of

---

[2] The final rule was issued on November 21, 2024. *Defining Larger Participants of a Market for General-Use Digital Consumer Payment Applications*, CFPB (Nov. 21, 2024), https://tinyurl.com/Digital-LPR (to be codified at 12 C.F.R. pt. 1090).  The final rule imposes supervision only on entities who complete over 50 million consumer payment transactions annually, and GPC products could fall beneath that threshold in a given year.  The supervision that CFPB attempts to impose here, however, lasts indefinitely.  And the supervision imposed by the final rule does not label GPC as a "risk" to consumers, while the supervision imposed here does and thus has greater reputational consequences.

erroneous P2P transfers, GPC explained that some of the consumers who complained had not received refunds because they failed to respond to GPC's requests for the basic information required to evaluate their concerns (thus precluding further investigation).  In other cases, GPC not only completed a thorough investigation but had actually refunded the consumer's money (thus completely resolving the consumer's concerns).  *Id.* at 10a ¶¶ 40-41.  As discussed further below, the CFPB's designation order wholly ignored this evidence.

55.    The CFPB then filed a supplemental reply, asserting, among other things, that "past conduct can serve as the sole basis for placing a covered person under supervision"—*even if there is no risk of future harm.*  Supplemental Reply Brief of Initiating Official at 6 (Feb. 14, 2024) ("CFPB Supp. Reply").  But the Initiating Official also asserted that, even assuming *arguendo* that the "possibility of future harm is necessary" the risks would persist "through any wind-down."  *Id.* The Initiating Official speculated that (1) the wind-down "may not proceed," (2) "[c]onsumers may face unexpected fees in the process of withdrawing funds," and (3) GPC may not have provided a method for "unbanked consumers who funded Google Pay with prepaid cards" to receive their remaining Google Pay Balance funds.  *Id.*

56.    The supplemental filing also took the position that the CFPB could supervise a company if it had just a "modest" degree of confidence that the company might pose *some* risk to consumers and that the risk identified need not have anything to do with the actual statutes and regulations that the agency is charged with enforcing.  *Id.* at 10.

57.    At the second supplemental oral response, GPC disproved each of the Initiating Official's newly identified risks.  GPC explained that the retirement would certainly occur (as proved true), that any fees for withdrawing funds had already been disclosed and would not materially change during the retirement (and would be reduced after the retirement), and that no

consumers had funded Google Pay with prepaid cards for years, but that in any event unbanked users could request a physical check. *See* 2d Supplemental Oral Response Transcript at 14, 18-20 (Feb. 23, 2024) ("2d Supp. Oral Resp. Tr."). GPC also argued that identifying past risks to consumers was insufficient, particularly where the relevant product was being retired, because the statute requires the agency to conclude that conduct "*poses* risks to consumers" and because supervision is inherently forward-looking. *Id.* at 15-16 (emphasis added).

5.    *Recommended Determination and Further Supplemental Briefing.*

58.    On March 1, 2024, the CFPB Director received a recommended determination in this matter. By that point, the matter should have been resolved. Nevertheless, on April 23, 2024, the Bureau reached out once more in search of new evidence and new theories. It ordered GPC to file another supplemental brief (1) identifying any updates relating to the planned product retirement and (2) explaining its position on whether GPC (or its affiliates) is a "service provider" to a bank with regards to various products, including those offered by Google LLC. CFPB Order for Supplemental Briefing (Apr. 23, 2024). GPC filed a supplemental brief explaining that there were no changes or updates to the planned product retirement and that the product retirement was proceeding as planned, and that, among other things, none of the listed products in the April 23 Order renders GPC (or Google LLC) a "service provider" with a depository institution that would allow for supervision under 12 U.S.C. §§ 5515(d) and 5516(e).

59.    On June 7, 2024, GPC notified the Bureau that the planned retirement was complete.

**C.    CFPB's Designation Order**

60.    Five months later, on November 8, 2024, the Bureau issued its Order designating GPC for supervision. The Bureau published the Order on December 6, 2024. The Order doubled

down on the Bureau's erroneous legal positions; relied on unsupported allegations and speculation; and ignored most of the evidence GPC provided during the administrative process.

a.    The Bureau's Legal Conclusions Are Flawed

61.    The Bureau began by describing its far-reaching and erroneous interpretation of its supervisory authority. It claimed the right to designate, in its discretion, any nonbank company offering consumer financial products or services for supervision based on any quantum of alleged risk, regardless of its materiality or likelihood. *See* Order 1-3. It stated that "Congress intended to delegate to the CFPB the discretion to determine whether the character and magnitude of the risks posed by a particular covered person's conduct merit supervision." *Id.* at 2. In doing so, it ignored "one of the background legal principles against which all enactments are adopted": "*de minimis non curat lex* ('the law cares not for trifles')." *Wisconsin Department of Revenue* v. *William Wrigley, Jr., Co.*, 505 U.S. 214, 231 (1992). The Bureau's claim of a sweeping delegation of authority necessarily raises two substantial constitutional questions:

62.    *First*, the source of that claim is purported congressional *silence*: Ignoring the Supreme Court's major-questions jurisprudence cited by GPC, the Bureau claimed that "Congress's election *not* to use more specific or directive language" was the source of its purportedly unbounded authority. Order 2 (emphasis added); *see also id.* at 16-17. The major-questions doctrine forecloses agencies from claiming "sweeping and consequential authority" based on silence. *West Virginia* v. *EPA*, 597 U.S. 697, 722-723 (2022). "The agency instead must point to 'clear congressional authorization' for the power it claims," *id.*, and the Bureau simply cannot do so. It is "highly unlikely" that Congress intended to provide unbounded "agency discretion" to pick and choose which businesses posing risks of any kind and quantity should be subjected to the heavy artillery of Bureau supervision, and it is "even more unlikely that it would

achieve that through such a subtle device" as the narrow provision at issue here. *MCI Telecommunications Corp.* v. *AT&T*, 512 U.S. 218, 231 (1994).

63.    The Bureau's interpretation also unduly "intrud[es] into an area that is the particular domain of state law," which is the well-established and extensive systems of state supervision of money transmitters. *Alabama Association of Realtors* v. *Department of Health and Human Services*, 594 U.S. 758, 764 (2021); *Gregory* v. *Ashcroft*, 501 U.S. 452, 460 (1991) (noting that courts "assume" that Congress does not lightly legislate in "areas traditionally regulated by the States").

64.    Contrary to the Bureau's claim, Order 17, the major-questions doctrine is not limited to *individual actions* of vast significance; it applies when the agency *claims authority* of such significance, as it has done here.  And applying the Bureau's new legal interpretation of its authority, it could designate for supervision tens of thousands of companies for de minimis alleged risks.

65.    The CFPB's previous acknowledgment that no consumer financial product or service presents zero risk renders its claimed authority especially expansive.  The Bureau takes the view that any consumer financial product or service is either low, medium, or high risk.  *See* Consumer Risk Assessment, CFPB, https://tinyurl.com/consumerriskassessment (last visited Nov. 18, 2024).  If the Bureau is empowered to supervise entities presenting any level of alleged risk, the Bureau is claiming the right to supervise any entity that offers *any* consumer financial products or services.

66.    The Bureau next erroneously claimed the right to base its supervisory designations on an undefined set of "risks" to consumers, which are untethered to potential or actual violations of the consumer financial protection laws the agency is charged with administering.  But the

Bureau's supervisory function is directed to "supervising covered persons *for compliance with Federal consumer financial law*." 12 U.S.C. § 5511(c)(4) (emphasis added); *see also Seila Law LLC* v. *CFPB*, 591 U.S. 197, 206 (2020) (the CPFB has responsibility for "implementing and enforcing a large body of financial consumer protection laws") (internal quotations omitted). The Bureau's expansive approach contrasts with the Bureau's earlier acknowledgement that, before designating an entity for supervision, it would consider whether the entity has engaged in conduct that "potentially violates Federal consumer financial protection law." 78 Fed. Reg. at 40,357.

67.    Next, the Bureau sets for itself a "relatively lenient standard[]" of proof for supervision. Order 3. According to the Bureau, the "reasonable cause" standard requires "more than suspicion but less than a preponderance of evidence." *Id.* n.12 (quoting *United States* v. *Chen*, 99 F.3d 1495, 1503 (9th Cir. 1996)).

68.    Most strikingly, the Bureau arrogated to itself the power to supervise entities based entirely on products that they no longer offer. It claimed that such authority exists because the statute permits supervision of a covered person that "is engaging, or has engaged, in conduct that poses risks to consumers." *Id.* at 14. But the present perfect tense of "has engaged" does not negate the present tense of "poses." *See Carr* v. *United States*, 560 U.S. 438, 448 (2010) (relying on "Congress' choice of verb tense to ascertain a statute's temporal reach"). The statute may allow past conduct to serve as the basis for supervision, but only when that conduct reveals a *current or future* risk to consumers. Even if GPC's past product had posed risks to consumers (it did not), such product does not *now* indicate risk to consumers because the product in question—the P2P product—*no longer exists*. The CFPB's absurd interpretation is impermissible. *See, e.g. PHH Corp.* v. *CFPB*, 839 F.3d 1, 54 (D.C. Cir. 2016).

69.    The Bureau strained to argue in the alternative that there was a risk of future harm: "Google *may* reenter the P2P payment market or engage in *other* [entirely unspecified] conduct that poses similar risks to consumers."  Order 15.  The Bureau provided no evidence in support of this speculation, nor did it provide any reason to question the GPC's business reasons for retiring the P2P product.  As GPC explained to the public on February 22, 2024, it was retiring the P2P product to "simplify the app experience."  *See* Joris van Mens, *supra* note 1.  The Bureau provided no explanation why GPC would decide to reverse course and resurrect a product that it has publicly stated it no longer needs.  The Bureau also suggests that entities could escape supervision by retiring the products that gave rise to the alleged risks the Bureau identified.  Order 15.  But this is not a case of evasion—GPC retired the P2P product for legitimate business reasons, and the CFPB can present no evidence to the contrary.

70.    The Bureau lastly claimed that "the unwinding of Google's P2P payment platform itself poses risks to consumers."  *Id.* at 16.  GPC previously explained to the Bureau that it had a plan in place to address any consumer concerns, and, in any event, that "unwinding" is complete and cannot be a basis for future supervision.  Additionally, the Bureau presents nothing but speculation that "consumers may be confused" as to aspects of the product's retirement.  *Id.* Speculation cannot satisfy the CFPB's burden of showing "reasonable cause" to believe that GPC's conduct poses risks to consumers.

71.    The Bureau's approach to its "risks to consumers" supervisory authority renders much of the remaining nonbank supervision authority granted to the agency by the Dodd-Frank Act superfluous.  If the Bureau were free to exercise supervisory authority based on immaterial past or present risks regardless of whether they are related to the Federal consumer financial laws, there would be no reason to grant the Bureau more specific statutory authority to supervise the

"origination, brokerage, or servicing of loans secured by real estate for use by consumers primarily for personal, family, or household purposes, or loan modification or foreclosure relief services in connection with such loans," the offering or provision of "any private education loan," or the offering or provision of any "payday loan."  12 U.S.C. § 5514(a)(1)(A), (D), (E).  Nor, for that matter, would there be reason for the Bureau to go through laborious rulemakings to identify "larger participant[s] of a market for other consumer financial products or services."  *Id.* § 5514(a)(1)(B).  An interpretation of a statute that renders so much language superfluous is unacceptable.  *See, e.g., National Ass'n of Manufacturers* v. *Department of Defense*, 583 U.S. 109, 125 (2018).

72.    *Second*, the Bureau's broad interpretation of "risks to consumers," if accepted, would mean that Congress failed to provide an intelligible principle to cabin the Bureau's discretion.  To be constitutional, the statute must have an "intelligible principle" to guide the Bureau's exercise of its discretion.  *Gundy*, 588 U.S. at 135.  An interpretation that authorizes the Bureau to supervise any company that has ever posed any alleged risk of any kind—as long as the company offers something that counts as a "consumer financial product or service" under the broad definition in the statute, *id.* § 5481(5)—would not suffice.  The statute must be interpreted to avoid this unconstitutional result.  *See Public Citizen* v. *United States Department of Justice*, 491 U.S. 440, 465-466 (1989).  The exceedingly thin bounds that the Bureau acknowledges do exist—that there be a finding of risks to consumers of any quantum or kind based on information from any source after notice and opportunity to respond—are procedural limitations, not standards, and do not resolve the constitutional infirmity of the CFPB's approach.

73.    In sum, the statutory language, the broader structure of the statute, the major-questions doctrine, the anti-absurdity canon, the non-delegation doctrine, and any common sense

understanding of the purpose of supervision confirm that Congress did not empower the Bureau to designate a company for ongoing supervision based on a retired product, nor is it entitled to base supervision on any quantum or type of risks to consumers as determined in the Director's discretion. The Bureau's Order is therefore statutorily and constitutionally infirm.

*b.    The Bureau's Factual Findings Are Deficient*

74.    Even if risks pertaining to a retired product were relevant (they are not), the Bureau's determination of past risks was deficient. The Bureau's designation order described 26 consumer complaints that purportedly provided its basis for supervision, but altogether ignored GPC's prior responses to, and evidence regarding, these complaints. By ignoring GPC's evidence and responses, the Bureau made an arbitrary and capricious decision that is not supported by substantial evidence. The Bureau's failure to address GPC's responses is particularly flawed because its responses relied in part on information about the complaints that GPC possessed in its own internal systems and was not available to the CFPB through the CFPB complaints database.

75.    For example, the Bureau's decision relied on a complaint as to which GPC had already explained that "GPC did investigate and 'did not see any transactions linked to the payments profile provided,'" and "[t]he consumer did not respond or upload the additional information" requested by GPC. Grant Supp. Decl. ¶ 39; Order 9 nn.54, 55. The Bureau did not address this response or explain how GPC's resolution of that complaint indicated a risk to consumers.

76.    The Bureau relies on additional complaints to support its assertions that GPC did not investigate consumer complaints and that GPC failed to provide consumers a sufficient explanation of its conclusions. But GPC previously responded that, for each of these complaints, GPC "explained the status of the investigation" to the consumer. *See* Grant Supp. Decl. ¶ 24. By way of example, for one complaint, GPC explained that its "investigation found no system errors,"

"that the money was successfully transferred to the recipient," and that the transactions were "legitimately from [the user's] account." *Id.* ¶ 26. In fact, "a representative from Google Pay Support discussed the complaint with the consumer, and the consumer reviewed the additional documentation that GPC relied on in conducting its investigation and making its error determination." *Id.* ¶ 35.

77.    Additionally, the Bureau relied on two complaints as to which GPC provided evidence that its "investigation found no system errors," "the money was successfully transferred to the recipient," and "the transactions were legitimately from the user's account." *Id.* ¶ 26; Order 9 n.54. The Bureau again stood silent in response.

78.    The Bureau relied further on a complaint as to which GPC had previously explained that the user had "violated GPC's terms of service." Grant Supp. Decl. ¶ 25; Order 9 n.55. In yet another, the "consumer did not respond to GPC's request [for information], even though GPC informed the consumer that, without that response, GPC could not continue its investigation." Grant Supp. Decl. ¶ 29; Order 9 nn.56, 57.

79.    The Bureau's complete and inexplicable failure to respond in its Order to GPC's arguments and evidence regarding these complaints violates well-settled administrative law principles and renders its decision invalid. *See, e.g.*, *Tesoro Alaska Petroleum Co.* v. *FERC*, 234 F.3d 1286, 1294 (D.C. Cir. 2000) ("The Commission's failure to respond meaningfully to the evidence renders its decisions arbitrary and capricious. Unless an agency answers objections that on their face appear legitimate, its decision can hardly be said to be reasoned.").

80.    The Bureau also cited several complaints in which GPC used similar language in responding to multiple customers. Order 10. The Bureau did not demonstrate any risk to consumers posed by the use of such language. As GPC had previously argued, the Bureau itself

recognizes the value of templates in supporting consistency across examinations. *See, e.g.*, Examination Manual at 2; *Sample letters to dispute information on a credit report* (accessed Feb. 2, 2024), https://tinyurl.com/disputesample. Additionally, the fact that consumers complained or were unsatisfied with the response does not make GPC's explanations inadequate. Regulation E requires institutions to conduct an investigation and provide a written explanation to the consumer when it determines that no error occurred based on the information available, 12 C.F.R. § 1005.11(c), (d)(1), and GPC has satisfied that standard. Even under the Bureau's nonbinding interpretation of the regulation, this explanation need not describe every document, piece of evidence, or other information that GPC relied on in making its determination. *See* Consumer Financial Protection Bureau, Supervisory Highlights, Issue 22 § 2.3.3 (Sept. 2020). The Bureau thus failed to provide any explanation of the connection between the facts it found and the decision it made—much less a reasoned explanation.

81. As a catch-all, the Bureau then claims that it "relied on 267 consumer complaints," Order 19, but to this day, the Bureau has not described its concerns regarding more than 33 such complaints to GPC and has therefore not provided GPC with a meaningful, much less "reasonable," opportunity to respond to them. As the Bureau acknowledges, these complaints are "unverified," and while it argues that no verification requirement exists under the statute, it violates basic principles of fairness and rational agency decision-making to subject an entity to supervision based on complaints that the agency has not investigated or confirmed.

82. Moreover, the CFPB has failed to address the fact that the 33 complaints (or the larger set of 267 complaints) constitutes only a tiny fraction of the "millions" of P2P transactions that GPC processed during the relevant time before prior to the retirement of the product. CFPB

Supp. Br. 17.  Under any reasonable interpretation, this number of unverified complaints cannot constitute "reasonable cause" to justify a finding of "risks to consumers."

83.    Additionally, contrary to the Bureau's unsupported assertion, Order 11, GPC notifies every consumer that they may reach out to GPC's support team with any questions, concerns, or follow-ups regarding GPC's determination and provides a secure portal for accessing the relevant documentation, should the customer seek to pursue further avenues of recourse.  GPC Resp. to Supp. Br. 15, 6a ¶ 23; 2d Supp. Oral Resp. Tr., 39-40.  In the Order, the Bureau cited a policy that it mischaracterizes as prohibiting GPC customer support agents from providing additional documentation to customers.  Order 11.  As GPC has previously explained to the CFPB in detail, the policy merely instructs customer support agents to consult with another team that has access to the appropriate documentation and can upload it to a secure portal.  This is an appropriate policy that helps to ensure that confidential customer documentation does not fall into the wrong hands.  GPC Resp. to Supp. Br. 22a.  The Bureau's decision to ignore GPC's explanation of the policy is another clear violation of administrative law principles.  *See Genuine Parts Co*. v. *EPA,* 890 F.3d 304, 346 (D.C. Cir. 2018).

84.    The Bureau contends that GPC failed to limit consumers' liability for unauthorized transactions, although it notes that GPC maintained a policy to the contrary.  Order 11.  The Bureau raised this argument in its supplemental brief without citing any specific complaints that provided a basis for this position.  CFPB Supp. Br. 11, 13.  The Order cites three specific examples of this complaint, Order 11 nn.68, 69, but as GPC previously explained to the Bureau, GPC investigated each of these complaints and determined that no error or unauthorized transfer had occurred.  Grant Supp. Decl. 6 ¶¶ 26, 39 (internal quotation marks and brackets omitted).  The Bureau violated the

APA by ignoring this evidence, *Genuine Parts*, 890 F.3d at 346, and financial institutions are not required to limit consumers' liability in these circumstances, *see* 12 C.F.R. § 1005.6(b).

85.    The CFPB also erred in brushing off the independent consultant report that GPC submitted to the Bureau. *See* GPC Resp. 86a-91a. Contrary to the Bureau's assertions, the Treliant report explains the methodology it used in reviewing the complaints found in the CFPB database in the relevant time period. Among other things, Treliant consulted information about the complaints that was available in GPC's internal systems. That methodology amply supports Treliant's conclusions that "GPC was responsive to complaints and meaningfully engaged with consumers to resolve their concerns;" that "GPC generally handled complaints related to its P2P and Google Pay Balance products appropriately;" that, contrary to the CFPB's suggestion, the vast majority of complaints reviewed "did not allege fraud, scams, or unauthorized transactions;" and that it "did not see evidence of a material risk to consumers with respect to Federal consumer financial laws." *Id.* at 89a. While the CFPB attempts to fault the Report for not, in the agency's view, adequately substantiating its observation that GPC has a "relatively low amount" of complaints compared to financial institutions of similar size, that observation was based on Treliant's prior experience, which includes "decades of financial institution experience managing customer-facing operations and specialized consulting and advisory roles." *Id.* at 90a. In any event, that finding is not essential to Treliant's qualitative findings about the complaints.

86.    Further, although GPC detailed in a declaration the extensive compliance program it had in place, which is administered by experienced compliance professionals and meets the regulatory expectations expressed by CFPB and other regulators, the Bureau rejected this evidence on the ground that it had no reason to defer to the company's "self-serving" description. Order 20. That reasoning suggests that the state of the company's compliance program will never affect the

"risks to consumers" determination because the CFPB will simply regard the company's evidence as self-serving.  Under applicable administrative law principles, an agency may not discount relevant evidence in this arbitrary manner.

87.     The Bureau also ignored evidence demonstrating GPC's multiple mechanisms to prevent and mitigate third-party fraud, while failing to explain what further steps, in the Bureau's view, GPC could have taken.  Before the P2P product's retirement, GPC, among other things, employed "machine learning to identify phishing and other fraud risks," alerted a "user when the user is sending a P2P transfer to someone who is not on that user's contact list," and provided customer education about how to avoid scams and frauds.  GPC Resp. 47a.  GPC operated a sophisticated risk engine that uses multiple signals to evaluate the fraud risk of a transaction and, depending on the risk identified, denied the transaction or required the user take certain actions before proceeding the transaction.  *See* 2d Supp. Oral Resp. Tr. 41.  In the event a user lost their phone, GPC enabled technology to "remotely lock the device, log out of a Google account, and erase any virtual payment card data."  GPC Resp. 48a.  And if someone did gain unauthorized access to the phone, the Google Pay app would nevertheless "require[] authentication to open the app to execute P2P transactions."  *Id.* at 47a.  Here again, the Bureau's decision simply ignores evidence that "undercuts its judgment."  *Genuine Parts Co.*, 890 F.3d at 346.

88.     The Bureau also erred in declining to take into account the fact that GPC is already subject to extensive supervision by numerous state regulators, which encompasses federal and state consumer protection requirements.  Congress was clear that in "exercis[ing] its authority under [the risk-based supervision provision]," the Bureau must "tak[e] into consideration . . . the extent to which such institutions are subject to oversight by State authorities for consumer protection."  12 U.S.C. § 5514(b)(2).  Congress further recognized that the Bureau is bound to

"minimize regulatory burden" by "coordinat[ing] its supervisory activities with . . . State bank regulatory authorities, and [] State agencies," which confirms that state supervision is a factor the Bureau was bound to consider. *Id.* § 5514(b)(3).

89.    These failures render the Bureau's decision arbitrary and capricious and unsupported by substantial evidence.

c.    *The Bureau's Process Was Defective*

90.    The Bureau lastly contends that it violated neither statutory nor regulatory rules through its repeated expansion of its purported grounds for supervision beyond those set forth in the Notice. Order 21. Not so. "It is axiomatic that an agency must adhere to its own regulations," and nothing in the relevant statute or regulations permits the Bureau to fix, through unauthorized supplemental briefing, a defective notice that fails to provide the evidence forming the basis for the Bureau's alleged supervisory authority. *Exportal Ltda.* v. *United States*, 902 F.2d 45, 49 (D.C. Cir. 1990) (citations omitted). Rather, Bureau rules prohibit the introduction of new evidence beyond the original Notice and Response. *See* 12 C.F.R. §§ 1091.103(a)(1), 1091.105(d), (e).

91.    The Bureau's standardless approach also renders any process insufficient. Because the Bureau, prior to its Order, declined to define "risks to consumer" and "reasonable cause," 78 Fed. Reg. at 40,357-40,358, and ultimately adopted an unconstrained interpretation, GPC had no opportunity to argue, by a known standard, that its conduct did not pose risks to consumers. *See ACA International* v. *FCC*, 885 F.3d 687, 700 (D.C. Cir. 2018) (agency action is arbitrary if "it fails to articulate a comprehensible standard for assessing the applicability of a statutory category" (internal quotation marks and citation omitted)).

33

## CLAIMS FOR RELIEF

## COUNT I

### In Excess of Statutory Authority
### 5 U.S.C. § 706(2)(C)

92.     Plaintiff incorporates by reference the allegations in all the preceding paragraphs.

93.     The CFPB's designation is final agency action because no further administrative process is available and because the order subjects GPC to supervision.  5 U.S.C. § 704; *Bennett* v. *Spear*, 520 U.S. 154, 177-178 (1997).

94.     GPC is "adversely affected or aggrieved" by this action because it has been publicly designated as posing risks to consumers and will therefore be subjected to burdensome supervision.  5 U.S.C. § 702.

95.     GPC is likely to be irreparably harmed by the designation because, among other things, supervision is burdensome and costly, has negative reputational consequences, and, among other things, the CFPB claims the authority to obtain attorney-client privileged information during the process of supervision.

96.     To exercise supervisory authority, the CFPB must have "reasonable cause to determine" that the person "is engaging, or has engaged, in conduct that *poses* risks to consumers with regard to the offering or provision of consumer financial products or services."  12 U.S.C. § 5514(a)(1)(C) (emphasis added).

97.     The relevant "risks to consumers" within the meaning of the statute refer to those current or future risks that arise out of the potential or actual violations of Federal consumer financial laws, because the Bureau has been tasked only with "implementing and enforcing a large body of financial consumer protection laws."  *Seila Law*, 591 U.S. at 206 (internal quotation marks and brackets omitted and emphasis added) (citing 12 U.S.C. § 5511(a)).

98.     The relevant "risks to consumers" within the meaning of the statute must go beyond minimal or routine alleged risks to consumers inherent in the offering of consumer financial products or services.  To be supervised for "risks to consumers," Congress envisioned that the risks found by the CFPB must reach a level of materiality or significance.  Whatever the formulation, the presence of any quantum of risk is insufficient.  Nor may the risks be speculative.

99.     To justify supervision under § 5514(a)(1)(C), defendants must therefore identify a material risk of harm arising out of potential or actual violations of Federal consumer financial law.

100.     To the extent that defendants assert authority to supervise *any* company creating *any* risk of *any* kind whenever that company offers "consumer financial product or service," that interpretation would be contrary to the text and structure of the CFPB, would intrude on traditional areas of state regulation, would violate the major-questions doctrine, would violate the non-delegation doctrine for lack of an intelligible principle to guide the Bureau's discretion, and would be contrary to the constitutional-avoidance and anti-absurdity canons.  *See West Virginia*, 597 U.S. at 722-723; *Alabama Association of Realtors*, 594 U.S. at 764; *Gundy* v. *United States*, 588 U.S. 128, 149 (2019) (Gorsuch, J., dissenting); *McNeill* v. *United States*, 563 U.S. 816, 822 (2011); *Public Citizen*, 491 U.S. at 465-466.

101.     Because defendants' designation does not identify any conduct that "*poses*" a current or future risk of harm to consumers, it is in excess of statutory authority.  Defendants cannot impose supervision based on a retired product.

102.     Because defendants' designation of GPC is based on an unreasonable interpretation of the statute, its action is in excess of statutory authority.

103.    Because defendants' designation fails to identify "risks to consumers" that are material and that arise out of violations or potential violations of Federal consumer financial law, its action is in excess of statutory authority.

104.    Defendants' designation of GPC is therefore in excess of statutory authority and must be set aside.  5 U.S.C. § 706(2)(C).

## COUNT II

### Arbitrary and Capricious
### 5 U.S.C. § 706(2)(A)

105.    Plaintiff incorporates by reference the allegations in all the preceding paragraphs.

106.    Defendants' decision was arbitrary and capricious because, among other things, defendants have:

a.    unreasonably designated GPC for supervision even though the P2P product—the only product that is within scope and alleged to pose risks to consumers—had been retired;

b.    repeatedly changed the asserted basis for its position that GPC poses a risk to consumers each time that GPC had an opportunity to respond to new alleged risks;

c.    refused to place the matter in abeyance while GPC provides status reports regarding the status of the retirement;

d.    failed to articulate a reasonable or discernable standard that the Bureau would apply in determining whether a particular company poses risks to consumers;

e.    failed to explain why any of the alleged risks to consumers would constitute a sufficient risk arising out of a potential or actual violation of any Federal consumer financial law;

f.     ignored evidence and arguments advanced by GPC about the product retirement, the lack of risks to consumers, GPC's compliance program, state regulatory regimes, GPC's efforts to reduce fraud, and the statutory language;

g.     accepted the unverified allegations in a small number of consumer complaints, and knowingly ignored GPC's specific evidence contradicting such complaints, in some instances, and showing how the complaints were properly resolved, in others;

h.     failed to explain why the advantages of supervision outweigh the substantial costs to GPC, particularly in light of the product retirement;

i.     violated the Bureau's own procedural rules by, among other things, failing to include all bases for supervision in the Notice, failing to summarize the documents upon which the agency relied, and providing additional opportunities for the Initiating Official to identify risks to consumers;

j.     failed to articulate why the Bureau would proceed with a risk-based designation rather than a larger-participant rulemaking;

k.     threatened to publicize the risk-based designation unless GPC agreed to forfeit its statutory and regulatory right to contest the basis for supervision, and

l.     otherwise reached the final decision in a manner that was arbitrary and capricious, for the reasons given in Counts 1, 3, 4, and 5.

107.    Because the designation of GPC was arbitrary and capricious in multiple ways, it must be set aside.  5 U.S.C. § 706(2)(A).

## COUNT III

### Without Observance of Procedure Required by Law
### 5 U.S.C. § 706(2)(D)

108.    Plaintiff incorporates by reference the allegations in all the preceding paragraphs.

109.    Defendants failed to provide plaintiff with a "reasonable opportunity to respond" to the Notice of Reasonable Cause by failing to provide a standard by which defendants determine "reasonable cause" of "risks to consumers," failing to rely on specific evidence, and failing to show a nexus between the evidence and defendants' standard.  12 U.S.C. § 5514(a)(1)(C).

110.    Defendants violated the Bureau's own regulations in providing the Initiating Official an opportunity to file a supplemental brief raising numerous new arguments and evidence.

111.    Defendants unreasonably departed from the Bureau's own procedures by repeatedly articulating new theories of wrongdoing in support of a finding that GPC poses risks to consumers.

112.    Defendants' Order relies on facts, documents, and arguments not found in the Notice of Reasonable Cause.

113.    Because the designation was issued "without observance of procedure required by law," it must be set aside.  5 U.S.C. § 706(2)(D).

## COUNT IV

### Unsupported by Substantial Evidence
### 5 U.S.C. § 706(2)(E)

114.    Plaintiff incorporates by reference the allegations in all the preceding paragraphs.

115.    There was insufficient evidence in the record to support any conclusion that GPC poses risks to consumers or posed risks to consumers in the past.  The record evidence was speculative, rebutted, linked solely to a retired product, ignored contrary evidence, and introduced belatedly in violation of procedural requirements.

116.    Because the designation was "unsupported by substantial evidence," it must be set aside.  5 U.S.C. § 706(2)(E).

## **PRAYER FOR RELIEF**

Plaintiffs respectfully pray that this Court enter an order and judgment:

1.    Vacating and setting aside the designation;

2.    Declaring that the Bureau's designation is arbitrary and capricious, in excess of statutory authority, without observance of procedure required by law, and unsupported by substantial evidence;

3.    Preliminarily and permanently enjoining defendants and any relevant officers, employees, and agents from commencing supervision, or enforcing, implementing, applying, or taking any action whatsoever under, or in reliance on, the designation;

4.    Awarding plaintiff the costs of this litigation, including reasonable attorney's fees; and

5.    Entering such other and further relief as this Court may deem just and proper.


Dated: December 6, 2024                    Respectfully submitted,

By: */s/ Kannon K. Shanmugam*
Kannon K. Shanmugam (D.C. Bar No. 474304)
Roberto J. Gonzalez (D.C. Bar No. 501406)
Samuel Rebo (application for admission
*pro hac vice* forthcoming)
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
2001 K Street, NW
Washington, DC 20006-1047
Tel: (202) 223-7325
kshanmugam@paulweiss.com
rgonzalez@paulweiss.com
srebo@paulweiss.com

Max H. Siegel (application for admission
*pro hac vice* forthcoming)
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064
Tel: (212) 373-3000
msiegel@paulweiss.com

*Counsel for Plaintiff Google Payment Corp.*